The fourth case for argument today is Kinney v. St. Mary's Health. Mr. Bison, may it please the court, Kyle B. Secker on behalf of Appellant Anna Kinney. We are here today because Ms. Kinney filed an employment discrimination claim against her employer under the ADA for gender discrimination under Title VII and for violations of the District Court graded summary judgment as to all of her claims. We are appealing three or four of those claims today, starting first with her ADA reasonable accommodation claim. The District Court ruled Ms. Kinney's accommodation request that she work from home three days per week, two days a week in the office of six hours, and that she limit face-to-face contact or meetings to 15 minutes was not a reasonable request, and that the defendant's expectation that she be on or on campus five days per week, 40 hours per week was a reasonable and legitimate requirement of the job. So can I ask you, I mean, you're raising some interesting questions. Since much of the world, you know, went remote for some period of time, either six months, in their case, maybe about six months, but a great number of employers at this point have revisited those arrangements, have said the world is back up and running. This court prefers you to be here in person, and we're telling you to do that. It doesn't mean you couldn't have been on Zoom if it had been two years ago, but normally we let employers define the key requirements for a job. And one of those definitions, traditionally, has always been you actually have to be there at work. You have to show up, and just because it was possible to kind of limp along in the remote world post-COVID doesn't convince me that this employer wasn't within its rights to say now that we're back up and running, we expect a person with the responsibilities of the job that Ms. Kinney had to be there, and they indeed got complaints from people when she wasn't there, as I recall. Well, there's several points to that question, Your Honor. One is there's a difference between showing up for work and being on campus, if you will, or in the office, and it is a much different world than three years ago. I think things have changed. Technology, Zoom, I have an iPhone 8, but even I can do things remotely now. Things of that nature change where working from home or remotely and not being physically in the office have changed significantly. We're not talking about an office. We're talking about she manages about 120 people, right? That's correct. Who are delivering hands-on patient care. They're putting them in MRI machines and x-ray machines, right? That's correct. So it's very much hands-on, and I assume that never actually stopped, right? No, that's correct, Your Honor. And that was to my second point. The defendant, the hospital actually ordered, CEO nationally and of the Indiana branch, ordered everybody to work from home as much as possible if you didn't have to be hands-on, which my client did. Yes. And the department went along just fine without her, and that's another important note is my client's not a licensed nurse. She doesn't hold any licenses. She doesn't run the machine. She doesn't interact with patients. But management is a very personal thing. Managing remotely, or at least it seems to me an employer could rationally conclude, managing needs to be done in person. And I'm a little concerned at the idea that it's the job of this court to decide when it's time to come back in person as opposed to the job of an employer. Well, it's not necessarily just about coming back in person. She had, the defendant had a mask requirement that exacerbated my client's disabilities. It wasn't. Why didn't she follow up on the face shield option, which isn't nearly so claustrophobic against your nose? She did, Your Honor. I believe the record reflects that in her testimony. She did have a conversation with Mr. Greeney about that. But I thought that was left up in the air. No, I don't believe so because in January 21, after her initial, was rejected, her initial accommodation request, January 21, she submitted additional paperwork and the rationale for it to Mr. Ilko, who's defendant's HR. And there's a subsequent conversation with Mr. Greeney between me and my client, or I'm sorry, my client, Mr. Greeney, about why the face shield would not work. And it created the same issues as a mask. Okay. And, but turning back to the point, I understand that there's a return to work, and they were returning to work. And my client went and got a secondary accommodation to try to work through this, where she could be at work two days a week. But she wanted to just stay in her office, right? That is correct, or wear a mask as little as possible. But she, even when she was in the office, or before COVID, if you will, and this issue came up, she was in her office most of the time anyway. She's not out on the floor, rotating around, talking to her 120 subordinates. That's the job of, she has two managers that manage the 120 subordinates. And she was able to do that just fine. And even when she took the, she had to take PTO and FMLA time when she came back because the accommodation wasn't honored, the department ran just fine. There's not any complaints. There's not any evidence that the department was failing. I thought there was undisputed evidence from some of her subordinates that her absence caused them to have to take on extra work. Prior to her taking, back in August or October of 20, there's only, there's testimony that there was anonymous complaints with Mr., or I'm sorry, Mr. Pratt and Mr. Greedy couldn't recollect those names. I believe the record only shows two written complaints, one anonymous, one from another employee out of 120 subordinates about my client not being in the office on a daily basis. It wasn't several complaints, or there's no evidence of them. Mr. Biesecker, a lot of your argument depends on your theory of constructive discharge. Yes. As I understand the record here, on August 1st of 2021, plaintiff told the defendant that she was planning to return the next week. That's correct. And the next communication the employer received was, I'm gone, I'm resigning. That's correct. So how does that add up to constructive discharge if she tells them I'm ready to come back? Because she wasn't able to do it. She took consideration and she'd have to wear the mask. The mask mandate was still in effect as of August 2021. And she just changed her mind. Yes. That doesn't sound to me like constructive discharge, frankly. Well, she was deciding between her mental and physical health and being able to return to work. And she weighed that and she wasn't able to do it. Is there evidence in the record to suggest that St. Mary's made any exceptions to the mask requirement? No, there aren't any exceptions in the record. No, there's not. I mean, it is, I'll say from general knowledge, I mean, it was a requirement for a long time during the COVID period that many hospitals and physician's offices, dentist's offices did have in place. That is correct. And that would be another argument that her accommodation had a foreseeable end when the mask mandate was dropped. This wasn't going to be a permanent request for an accommodation forever. As soon as the defendant dropped or the hospital dropped its mask mandate requirement, she would no longer have needed this accommodation. She could have been in the office five days a week without issue. It was completely regard the mask mandate. And it was sincere. She walked away from a six-figure job. I mean, it's not that she was playing some sort of game. I mean, the record reflects that she absolutely resigned or was constructively discharged from a six-figure job. And that's not something that can be done lightly in this scenario. Do you have just a word you want to say about the sex discrimination claims? Because the issue there, I think, bumps into the circuit law that we have related to claims that are essentially based on differences in qualifications. There has to be a pretty significant difference in qualifications before we would spot the choice of A over B or B over A as some sign of discrimination. And it's not clear that that kind of a difference in qualifications appears with either of the two people that you're pointing to. Well, in addition, and I do recognize the difference in qualifications, the case law is clear that they have to be significant. We believe, specifically with the Warwick County Hospital Administrator position, it's not only were the qualifications, difference in qualifications or my client's qualifications much better, but there's also the additional evidence that Mr. Mattingly was given the interim position by Mr. Perraud. But that was followed by a very open process with advertising,  so yes, Mr. Mattingly was given, somebody had to get the interim position, so why not Mr. Mattingly? But that wasn't proposed to anyone else, including my client, Mr. Perraud, and he immediately just tapped Mr. Mattingly for the position. But that's not the focal point of the discrimination complaint. The focal point is that she wasn't offered the permanent job. Correct. Correct, and he was given the permanent job. And in addition, I see my time is up. Okay, thank you. I think we have your point. Thank you, counsel. Mr. Padgett. Good morning. May it please the court. I'm Mike Padgett here representing St. Mary's. I'd like to go first to the accommodation claim that's been covered here. I think I just want to cover a couple of points that came up. So there's about 120 employees in the radiology department, and once the pandemic set in, that department did shut down entirely, but for a very brief period of time, and then they were back up and running. That was just a matter of perhaps weeks at most. So it was down, but then back up. So during that period of time, obviously nobody's working in the hospital, and then everybody came back to the hospital after that. Okay. In terms of the face mask issue that came up. Yeah, there was a request to a plaintiff to go check with her doctor to see if a face mask would solve her issue, and there was no response. Yeah, I thought that was just left up in the air, that it was discussed, but she never firmly took a position. Face masks are fine, even though masks aren't, and no one else said that from the hospital's point of view, that would be enough of a protection. Correct, and I believe that's reflected in the record, and that was certainly my client's position was, well, check on the face mask, see if that will be sufficient for you, and then we can move forward, and there was no further communication. On the question of essential functions, Mr. Padgett, is it correct that Ms. Kinney's boss was not aware that she was working from home for about six months? For a period of time, yeah, I don't know if it's exactly six months. I find that astonishing, if that was an essential function. It's a large hospital, it's a large facility. Ascension is a very large hospital. This is the one on the east side of Evansville? Yes, yeah, St. Mary's down there. I believe they used to deliver newspapers there. So, yeah, and he was not, her boss wouldn't have known differently necessarily unless he had occasion to see her in person in that facility. Why doesn't that suggest, though, that sitting at your home in front of a computer is all that's necessary to perform the job? That by itself doesn't mean she was performing the job sufficiently. I mean, sort of back to the conversation we were having a moment ago before I got to the podium, she's a manager. She's responsible for managing that entire department, and so she has to be there in person to manage that department, and no, it was not going well. It was not going well at all. In fact, there were multiple complaints, three written complaints to what they call their values line, and then one of the managers here reports to plaintiff testified that most of her direct reports complained to her about the situation. So oral complaints, I guess. Yes, yes, verbal complaints that she's not here, she's not supporting this, she's not part of the team, she's not leading the team. All of the things that you expect from the top leader of that department to do, she was not doing, and essentially wanted to literally phone it in, and that's just not sufficient. When did plaintiff's peers return in person? Oh, they all returned at the same time that the hospital essentially reopened, in very short order. And some of those folks never went. By April of 2020? I mean, everything was shutting down in March. Yes, and if you recall, there were sort of essential functions that continued. Radiology was viewed as, okay, maybe we can shut that down temporarily. You can put off some of those services. So the emergency department, obviously you can't close that down. So there's certain aspects of the hospital that continued unabated, and certainly her peers all worked on site throughout that entire time, but for if their department had a short shutdown. If there are any other questions on the accommodation issue, I'll move to that. I guess, if I can just circle back to the point that Judge Wood was making earlier, Mr. Padgett, I guess the question is how specific the evidence is here about the need for in-person management. It's certainly correct that we generally defer to employers' preferences and essential functions, but not all the time. There are exceptions, particularly if there are inconsistencies. And so what's the most compelling evidence, do you think, that for this job, in-person presence, most of it or all the time was an essential function? Yeah, and Judge Hamilton, I understand your distinction here between evidence sort of setting aside for the moment the court's general approach that says we're going to defer to the employer because the employer knows best in terms of how that job needs to be performed. I think in terms of the evidence of that, it's the position and the department. The department provides in-person services, and it's not like an office job where you can provide some of those services remotely. Well, you can't do a remote MRI. I mean, there's a very expensive machine that's sitting there in the hospital. I suppose somebody still needs to oversee that operation. Of course, yes. But yeah, it's the nature of the radiology department and the fact that she manages that. Well, let me just throw out, I mean, we wouldn't have to worry not only about this case, but as plaintiff's counsel points out, I mean, COVID has changed some things. And for example, suppose we were talking about the accounting department, the billing department, maybe the answer might be different. Yes, I think so. Yes. Attorneys might be different. Yes. But you can't provide radiology services remotely, and you can't manage radiology services remotely. But what if you have, take the accounting department, which you just agreed could perhaps be handled remotely. So suppose the accounting department is run by some stick-in-the-mud, yesterday-oriented person who says, no, we're just going to have these people come back. Because my idea of the work environment involves everybody here at work. And we did learn during COVID that actually you don't need to be standing there in the office or sitting there in many instances. And so will there be times, maybe this is one, maybe this isn't, where an employer's just dogged insistence that somebody come into work is not a legitimate requirement for the job? Well, so initially, I would say the burden to show that is on the plaintiff. And again, going back to the court start with, how does the employer define the essential functions of the job? That's sort of our starting point. And is there some affirmative declaration or some affirmative evidence that the employer's position is incorrect? And there are a whole host of reasons why employers would like to have their employees on site, not the least of which is interacting with co-workers, developing teamwork, being available to be supervised by their managers. All those things come into play. And so I think it's probably a tall order for a plaintiff to show that in-person work is not appropriate. It may well be, though, that more evidentiary development might be necessary on the employer's side as well, at least in some kinds of situations. And I do want to come back to your question, Judge Hamilton. I do think there's actual evidence here. The actual evidence lies in the fact that, frankly, the department was up in arms. So morale is very down. People are upset. I have to come to work every day. The person charged with managing me doesn't have to be here. So there's certainly that evidence that has had an impact on the entire department. If there's no other questions, I'll briefly go to the failure to promote claim. We've touched on it already in the opening. Essentially, we've noted the law that says you have to show a large disparity. And I would note that plaintiff's only evidence of discrimination there is her own opinion of her qualifications versus those of the individual hired. And with that, I'll take any further questions. Thank you, counsel. Case is taken under advisement.